IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION

STEVE BINGHAM                                                            PLAINTIFF

v.                                    CIVIL ACTION NO.: 1:10-CV-00123-GHD-DAS

CITY OF WEST POINT, MISSISSIPPI;
JASPER PITTMAN; ROB BOBO;
CHARLES COLLINS; and HOMER CANNON                      DEFENDANTS

MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT,
GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO STRIKE, AND
DENYING PLAINTIFF'S MOTION TO STRIKE IN ITS ENTIRETY

Presently before this Court are three motions: Defendants' motion for summary judgment [42]; Defendants' motion to strike [47] Exhibits E, F, and G of Plaintiff's response in opposition to the motion for summary judgment; and Plaintiff's motion to strike [53] Defendants' reply in support of the motion for summary judgment. After due consideration, the Court finds that the motion for summary judgment [42] should be granted in part and denied in part; Defendants' motion to strike [47] should be granted in part and denied in part; and Plaintiff's motion to strike [53] should be denied in its entirety.

*A. Factual and Procedural Background*

After Plaintiff Steve Bingham ("Plaintiff") was terminated from his job as chief of police of the City of West Point, he filed a timely EEOC charge alleging wrongful discharge, and upon receipt of the EEOC's statutory notice of the right to sue, timely filed this suit in federal court against the City of West Point, Mississippi, as well as Jasper Pittman, Rob Bobo,[1] Charles Collins, and Homer Cannon in their individual capacities and official capacities, alleging

---

[1] [sic]. Defendant's correct name, which shall be used throughout this opinion, is "Rod Bobo."

wrongful discharge based on reverse-race discrimination. In Plaintiff's complaint [1], filed May 5, 2010, Plaintiff asserted the following claims: (1) wrongful discharge under 42 U.S.C. § 1981 and 42 U.S.C. §§ 2000e *et seq.*; (2) wrongful discharge under Mississippi law; (3) defamation per se; and (4) intentional infliction of emotional distress. Plaintiff claimed he has suffered actionable emotional distress, loss of income, loss of other benefits associated with his former employment, and other damages "by reason of this illegal conduct by the City of West Point." *Id.* ¶¶ 23, 27, 31, 35. He seeks actual and punitive damages.

Plaintiff was hired as chief of police of the City of West Point, Mississippi, on November 1, 2006. Plaintiff had extensive experience in law enforcement, having served as chief of police of the cities of Taylorsville, Belzoni, and Clarksdale prior to his service at West Point. Plaintiff replaced retired City of West Point chief of police Bill Gibson. West Point's city-wide election was held in 2009. "As a result of this election, the racial composition of the selectmen changed to four African[-]American selectmen and one white selectman." *Id.* ¶ 13. Plaintiff claims he "faithfully, conscientiously, and properly performed all duties required of him as chief of police during the entire time he served in that capacity." *Id.* ¶ 12. However, on August 11, 2009, the city selectmen met and voted four to one to discharge Plaintiff from his job. *Id.* ¶ 14. The four selectmen who voted to discharge Plaintiff—Jasper Pittman, Rod Bobo, Charles Collins, and Homer Cannon—were African American.

Plaintiff claims he was wrongfully discharged from his job, "motivated, in part, by the plaintiff's race and the defendants' desire to replace the plaintiff with an African American" with "lesser qualifications" than Plaintiff. *Id.* Bobby Lane, an African American, has served as interim chief of police following Plaintiff's termination. According to Pittman, Lane has more than thirty years of law enforcement experience and previously had served as interim chief when

the City of West Point was looking to hire a new chief of police. Pittman Dep. [42-6] at 77. Community reaction to the interim chief has been mixed, *see id.* at 82, and at least one selectman has expressed doubt in Lane's ability to perform as permanent chief, *see* McBrayer Dep. [42-10] at 23, 26.

Plaintiff testified in his deposition that the "totality of the situation[—][n]o excuse, no reason, no nothing" led him to believe the selectmen's termination decision was based on race. Bingham Dep. [42-4] at 75. "Not once did any of [the selectmen] . . . say, 'Hey, here's an area of concern. Let's work this out. Let's do this.' " *Id.* at 112. Defendants testify that the board of selectmen had told Randy Jones, city administrator, to get in touch with Plaintiff to set up a meeting concerning his performance as chief prior to his discharge. Selectman Keith McBrayer, who voted against terminating Plaintiff, testified that the board never took action to set up such a meeting. McBrayer Dep. [42-10] at 18–19. By all accounts, no meeting between the board of selectmen and Plaintiff ever took place. Bobo testified that prior to Plaintiff's termination, Plaintiff came to Bobo's place of business and asked him if the City was planning to terminate him; Bobo told him "the place to discuss all that would be at board meetings. And we left it at that." Bobo Dep. [42-9] at 18–19. Defendants testify that Plaintiff was aware of the concerns Defendants had about his job performance. Plaintiff denies that he was aware of such concerns.

Defendants give several similar reasons for their decision to terminate Plaintiff, including low morale among police officers (City of West Point 30(b)(6) Dep. [42-5] at 6; Pittman Dep. [42-6] at 24–25); imbalance between number of detectives and patrolmen (Pittman Dep. [42-6] at 57; Collins Dep. [42-7] at 18; Cannon Dep. [42-8] at 18–19); Plaintiff's lack of community involvement (Pittman Dep. [42-6] at 92); low success rate of cases presented to the grand jury (City of West Point 30(b)(6) Dep. [42-5] at 8; Cannon Dep. [42-8] at 48–49); and

3

mismanagement of funds (Collins Dep. [42-7] at 22-23; Cannon Dep. [42-8] at 47; Bobo Dep. [42-9] at 13-14). Finally, Defendants cited Plaintiff's inflexibility about changing the structure of the police department.

Pittman testified that "[Plaintiff] had all black detectives," but "a lot of white officers . . . wanted to be detectives." Pittman Dep. [42-6] at 91. Pittman further testified that he had heard complaints from members of the community and police officers that Plaintiff was racist. *Id.* However, when questioned further, Pittman said he had no grounds to prove Plaintiff was racist, and "[i]n my dealings with [Plaintiff] on a personal level, . . . I don't think he's racist." *Id.* at 68. None of the other Defendants testified that they had any knowledge of such complaints about Plaintiff.

Selectman McBrayer expressed an entirely different view of Plaintiff as chief of police. McBrayer testified that Plaintiff was willing to meet with McBrayer and residents of his ward when the citizens had expressed concerns about lack of patrol presence in their neighborhood, and that after the meeting, "of course, the situation improved." McBrayer Dep. [42-10] at 10-11. McBrayer also testified that under Plaintiff's leadership, the police department was receiving substantial grants to move the department toward accreditation, and Plaintiff had served as president of the police chief association of the State of Mississippi—both of which were good for the image of the City of West Point as a whole. *Id.* at 17, 33.

All five selectmen claim that the decision to terminate Plaintiff was not motivated by race. Cannon testified: "[A]s well as I love Martin Luther King, if he had have been doing the same job and doing it the way that [Plaintiff] was doing, I'd have fired him." Cannon Dep. [42-8] at 74. But Plaintiff paints a picture of racial discord in the City of West Point, including alleged additional wrongful discharges of "other persons on account of race or . . . their efforts to

4

assist the plaintiff [in] vindicat[ing] his rights against wrongful discharge on account of race, by offering the truth as a rebuttal to the false and malicious allegations made by the defendants against the plaintiff." Pl.'s Compl. [1] ¶ 15. Plaintiff testified that "every white person" who has been terminated by the City or has resigned "is being replaced by black." Bingham Dep. [42-4] at 96, 107. Plaintiff further testified that he was told the police department was "arresting too many blacks. The only way to stop that is to pull out the—the pieces of the puzzle that are working in that area and replac[e] them." *Id.* at 107–08. Romelle Matthews and Jesse Anderson, two African-American police officers at the time Plaintiff was chief of police, testified by separate affidavits that Pittman told both of them that "the police department in West Point was arresting too many blacks on drug charges, and that not enough whites were being arrested in West Point on drug charges. Pittman said that West Point wanted a balance in the number of black arrests and white arrests. . . ." Matthews Aff. [45-5] ¶¶ 3–4; Anderson Aff. [45-6] ¶¶ 3–4. Pittman testified: "I made a statement that I wanted the police department to be fair and balanced. . . . [T]he community I stay in, the drug activity that was going on was done mostly by whites. . . . I didn't see no police out there . . . . [A]nd I . . . complained as a citizen—not only as a selectman, but as a citizen, I complained. And . . . it never was nothing done about it." Pittman Dep. [42-6] at 58–59. Pittman further stated: "[I]f you look at Romelle [Matthews] and the way he operated the narcotic[s] division, you had more blacks being—they kicked in more black doors than they did white doors. . . . [T]hat prompted that statement." *Id.* at 62. Both Matthews and Anderson testified that they refused to consider race when making arrests; as a result, Pittman began referring to them as "Bingham's Boys," a term both found racially offensive. Matthews Aff. [45-5] ¶¶ 3–4; Anderson Aff. [45-6] ¶¶ 3–4. After the new Board of Selectmen took office, Matthews was discharged and Anderson allegedly was demoted.

Plaintiff further claims his wrongful discharge was motivated in part by his reporting of some of the defendants' "course of illegal activity with impunity because of their status as selectmen." Pl.'s Compl. [1] ¶ 16. In Plaintiff's deposition, he explained he was referring to one or more traffic citations that had been issued to Defendant Pittman but had not been paid. Bingham Dep. [42-4] at 89–90. Later in the deposition, he testified that Cannon and Pittman were "involved in or alleged to have been involved in some water meter tampering and not paying bills. . . . I believe it got leaked that we were investigating." *Id.* at 115. Plaintiff has offered no further proof of Defendants' alleged "illegal activity."

Defendants filed a motion for summary judgment [42] on April 12, 2011. Since the filing of the motion for summary judgment, Plaintiff has conceded that no proof exists to substantiate his claims against the four selectmen in their individual capacities, as well as his state law claims for wrongful discharge, defamation per se, and intentional infliction of emotional distress. Plaintiff and Defendants have each filed motions to strike various items from the record.

*B. Motions to Strike*

On May 4, 2011, Defendants filed a motion to strike [47] three exhibits to Plaintiff's response in opposition to the motion for summary judgment: Exhibit E, the affidavit of Romelle Matthews; Exhibit F, the affidavit of Jesse Anderson; and Exhibit G, the complaint filed in Civil Action Number 1:10-CV-286. Defendants contend that Plaintiff failed to serve disclosures pursuant to Rule 26 of the Federal Rules of Civil Procedure, and therefore has never identified Romelle Matthews and Jesse Anderson as intended witnesses in the case. Defendants further contend that Exhibits E and F to the response should be stricken from the record, as they were submitted after the discovery deadline and the dispositive motion deadline and without leave of court. Plaintiff acknowledges his failure to submit Rule 26 disclosures, but contends that

Defendants have not suffered prejudice, nor do they claim to have suffered prejudice, by the inclusion of such materials. Plaintiff further contends that the information in the affidavits was known to Defendants before they viewed the affidavits, and that Plaintiff would "consent to any request the defendants may make to depose Matthews and Anderson in this action." Pl.'s Resp. Mot. Strike [49] at 2 n.1.

Defendants argue the complaint attached as Exhibit G should similarly be stricken in its entirety as it is neither authenticated, nor sworn to, by any person. Plaintiff contends the complaint should not be stricken in its entirety but that Defendants' objection to the use of the exhibit to show a pattern of discriminatory conduct by Defendants is proper. Plaintiff claims that the complaint should be considered for the limited purpose of rendering a timeline of events.

Rule 37(c)(1) of the Federal Rules of Civil Procedure provides that a party who "fails to provide information or identify a witness as required by Rule 26(a) or (e) . . . is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." FED. R. CIV. P. 37(c)(1). When a court within the Fifth Circuit must decide whether a party's violation of Rule 26 is harmless, the court considers four factors: "(1) the importance of the evidence; (2) the prejudice to the opposing party of including the evidence; (3) the possibility of curing such prejudice by granting a continuance; and (4) the explanation for the party's failure to disclose." *Tex. A&M Res. Found. v. Magna Transp., Inc.*, 338 F.3d 394, 402 (5th Cir. 2003).

The Court is of the opinion that Plaintiff's failure to file Rule 26 disclosures—while in violation of Rule 26 of the Federal Rules of Civil Procedure—was harmless. The evidence in Exhibits E and F is important to the case, as it supports Plaintiff's claims of racial discrimination. Defendants were apprised of the information contained within these exhibits and have not

demonstrated prejudice in their ability to prepare for trial as a result of the inclusion of such information. Finally, Plaintiff has explained the omission was due to the oversight of counsel. Thus, finding no harm in the inclusion of Exhibits E and F to Plaintiff's response in opposition to the motion for summary judgment, the Court hereby denies Defendants' motion to strike insofar as it pertains to the striking of Exhibits E and F from the record. In so doing, the Court notes that even if such materials were stricken from the record entirely, genuine disputes of material fact would still exist that would defeat summary judgment on the federal law wrongful discharge claims.

The Court grants Defendants' motion to strike insofar as it pertains to striking Exhibit G from Plaintiff's response in opposition to the motion for summary judgment, as that complaint contains information that is both not pertinent to this case and potentially a hearsay problem. Additionally, the complaint in Civil Action Number 1:10-CV-286 restates information contained within the affidavits attached as Exhibits E and F to Plaintiff's response in opposition.

On May 11, 2011, Plaintiff filed a motion to strike [53] Defendants' reply in support of the motion for summary judgment as untimely. The Court is of the opinion this motion is not well taken and shall be denied. Having ruled on both motions to strike, the Court now turns its attention to Defendants' motion for summary judgment.

### C. *Motion for Summary Judgment*

#### i. *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986); *Weaver v.*

*CCA Indus., Inc.*, 529 F.3d 335, 339 (5th Cir. 2008). The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322, 106 S. Ct. 2548.

The party moving for summary judgment bears the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S. Ct. 2548. Under Rule 56(a) of the Federal Rules of Civil Procedure, the burden then shifts to the non-movant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S. Ct. 2548; *Littlefield v. Forney Indep. Sch. Dist.*, 268 F.3d 275, 282 (5th Cir. 2001); *Willis v. Roche Biomedical Labs., Inc.*, 61 F.3d 313, 315 (5th Cir. 1995). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient" to preclude summary judgment; instead, "there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1985).

### ii. *Partial Summary Judgment on State Law Claims*

Plaintiff has conceded partial summary judgment is proper on all his claims except the wrongful discharge claims asserted under federal law against Defendant City of West Point and the individual defendants in their official capacities. Thus, the Court finds that partial summary judgment should be granted as to Plaintiff's state law claims for wrongful discharge, defamation per se, and intentional infliction of emotional distress. The Court further finds that partial

summary judgment should be granted as to Plaintiff's claims against Defendants Jasper Pittman, Rod Bobo, Charles Collins, and Homer Cannon in their individual capacities. Plaintiff's remaining federal wrongful discharge claims against the City of West Point and individual defendants will be addressed below, each in turn.

### iii. 42 U.S.C. § 1981 Wrongful Discharge Claims

Plaintiff claims Defendants City of West Point, Jasper Pittman, Rod Bobo, Charles Collins, and Homer Cannon wrongfully discharged him due to his race in violation of 42 U.S.C. § 1981. Section 1981, known as the "equal contracts rights" provision, was enacted shortly after the Civil War and provides in pertinent part that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a). Section 1981 defines "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b).

For Plaintiff to establish a prima facie case under Section 1981, he must "produce direct or circumstantial evidence of purposeful discrimination by the defendant." *Jatoi v. Hurst-Euless-Bedford Hosp. Auth.*, 807 F.2d 1214, 1219 (5th Cir. 1987) (citing *Ramirez v. Sloss*, 615 F.2d 163, 168 (5th Cir. 1980)). Section 1981 claims are analyzed "under the same evidentiary framework as Title VII claims." *Taylor v. Seton Brackenridge Hosp.*, 349 F. App'x 874, 876–77 (5th Cir. 2009) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)). Relief under Title VII is available only against employer, while relief under Section 1981 is also available against an individual supervisor or fellow employee. *Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 339 (5th Cir. 2003). "Section 1981 does not itself create a cause of action against

a municipality; rather, a plaintiff complaining of a municipality's violations of § 1981 must assert his claims via § 1983." *Crawford v. City of Houston, Tex.*, 260 F. App'x 650, 652 (5th Cir. 2007) (citing *Felton v. Polles*, 315 F.3d 470, 481–82 (5th Cir. 2002); *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 463–64 (5th Cir. 2001)). This requirement "is not a mere pleading formality." *Felton*, 315 F.3d at 482. Here, Plaintiff did not assert a claim under 42 U.S.C. § 1983 against either the City of West Point or the individual defendants in their official capacities as selectmen of the City of West Point. Thus, Plaintiff has no action under 42 U.S.C. § 1981, and the Court grants summary judgment on those claims.

> iv.    *42 U.S.C. §§ 2000e et seq. Wrongful Discharge Claims*

An employer may not terminate an employee because of the employee's race. 42 U.S.C. §§ 2000e-2(a)(1). "The language of Title VII makes plain the purpose of Congress to assure equality of employment opportunities and to eliminate those discriminatory practices and devices which have fostered racially stratified job environments to the disadvantage of minority citizens." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 800, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

Generally, only "employers" may be liable under Title VII. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citations omitted). To be an "employer" under Title VII, (1) the defendant must fall within the statutory definition; and (2) there must be an employment relationship between the plaintiff and the defendant. *Deal v. State Farm Cnty. Mut. Ins. Co. of Texas*, 5 F.3d 117, 118 n. 2 (5th Cir. 1993) (citation omitted). The statute defines "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees . . ., and any agent of such a person . . . ." 42 U.S.C. § 2000e(b). "Any agent" conveys Congress's intent to "import respondeat superior liability into Title VII." *Smith v.*

11

*Amedisys, Inc.*, 298 F.3d 434, 449 (5th Cir. 2002) (citations omitted). Although, while under certain circumstances—for example, when the supervisor has been delegated the employer's traditional rights such as hiring and firing—an immediate supervisor may be considered an "agent" and therefore an "employer" under Title VII, the supervisor faces liability solely in her official, not individual, capacity. *Harvey*, 913 F.2d at 227; *Grant v. Lone Star Co.*, 21 F.3d 649, 652–53 (5th Cir. 1994). A plaintiff may not maintain a Title VII action against both her employer and the employer's agent because the employer could then face double liability for the same act. *Id.* (citation omitted). In other words, joinder of both the City of West Point and individual defendants is redundant.

When there is no direct evidence of unlawful discrimination, as here, this Court is bound to follow the *McDonnell Douglas* framework to determine whether the plaintiff has a Title VII race discrimination claim. *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004). Under *McDonnell Douglas*, to sustain a race discrimination claim under Title VII, the plaintiff must first establish a prima facie case of race discrimination. *McDonnell Douglas*, 411 U.S. at 792, 93 S. Ct. 1817; *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 317 (5th Cir. 2004). The burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for terminating the plaintiff. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. 1817. Only then does the presumption of discrimination disappear and the burden shift back to the plaintiff to "offer sufficient evidence to create a genuine issue of material fact either (1) that [the employer's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [the employer's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is [the employer's] protected characteristic (mixed-motives alternative)." *Rachid*, 376 F.3d at 312. Even in *McDonnell Douglas*'s burden-shifting framework, the ultimate

burden remains with the plaintiff. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)). The Court will examine each element of the *McDonnell Douglas* framework in turn.

### 1. Prima Facie Case of Race Discrimination

Under *McDonnell Douglas*, Plaintiff must first make a prima facie case of race discrimination, which is to say, Plaintiff must demonstrate that he: "(1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy v. City of Shreveport*, 492 F.3d 551, 556–57 (5th Cir. 2007). Defendants concede that for purposes of their motion for summary judgment, it will be presumed that Plaintiff has established a prima facie case of employment discrimination. Def.'s Memo Supp. MSJ [43] at 4 n.1. Accordingly, the Court will move to the next step in the analysis.

### 2. Legitimate, Non-Discriminatory Reason for Termination

Because it is conceded that Plaintiff has established a prima facie case of race discrimination, the Court will next determine whether Defendants have expressed a legitimate, non-discriminatory reason for firing Plaintiff. Defendants contend that Plaintiff was fired by vote of the selectmen for reasons "including, but not limited to, personality problems, the organization of the police department, a concern that there was a low level of success on cases presented to the grand jury by investigators with the Police Department, and the perception that the Plaintiff was requiring a certain number of tickets to be written." Def.'s Mem. Supp. MSJ [43] at 7 (internal citations omitted). Defendants contend, correctly, that each selectman who

voted to terminate Plaintiff stated his reasons for doing so in his deposition testimony. Defendants give several reasons supporting their decision to terminate Plaintiff, including low morale among police officers (City of West Point 30(b)(6) Dep. [42-5] at 6; Pittman Dep. [42-6] at 24–25); imbalance between number of detectives and patrolmen (Pittman Dep. [42-6] at 57; Collins Dep. [42-7] at 18; Cannon Dep. [42-8] at 18–19); and Plaintiff's lack of community involvement (Pittman Dep. [42-6] at 92); low success rate of cases presented to the grand jury (City of West Point 30(b)(6) Dep. at 8; Cannon Dep. [42-8] at 48–49); and mismanagement of funds (Collins Dep. [42-7] at 22–23; Cannon Dep. [42-8] at 47; Bobo Dep. [42-9] at 13–14). Finally, Defendants cite Plaintiff's inflexibility about changing the structure of the police department.

This Court finds that Defendants' articulated reasons for Plaintiff's termination are legitimate and non-discriminatory. Thus, the burden next shifts back to Plaintiff to prove pretext or mixed motives.

### 3. Pretext/Mixed Motives

Because it is conceded that Plaintiff has made a prima facie case of race discrimination and Defendants have sufficiently rebutted this presumption by offering legitimate, non-discriminatory reasons for Plaintiff's termination, the Court must next examine whether Plaintiff has proven pretext or mixed motives. At this step in the analysis, the presumption of discrimination has disappeared and the burden has shifted back to Plaintiff to "offer sufficient evidence to create a genuine issue of material fact either (1) that [the employer's] reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that [the employer's] reason, while true, is only one of the reasons for its conduct, and another 'motivating factor' is [the employer's] protected characteristic (mixed-motives alternative)." *See Rachid*, 376 F.3d at

312. Defendants contend that Plaintiff has not shown, nor does the record show, evidence of pretext. The Court disagrees.

The Court acknowledges that "simply disputing the underlying facts of an employer's decision is not sufficient to create an issue of pretext." *See LeMaire v. La. Dep't of Transp. & Dev.*, 480 F.3d 383, 391 (5th Cir. 2007). The "existence of competing evidence about the objective correctness of a fact underlying a defendant's proffered explanation does not in itself make reasonable an inference that the defendant was not truly motivated by its proffered justification." *Little v. Republic Refining Co.*, 924 F.2d 93, 97 (5th Cir. 1991) (internal citation omitted). "Absent countervailing evidence, the trier of fact must accept the defendant's explanation as the real reason for the discharge." *Timmerman v. IAS Claim Servs. Inc.*, 138 F.3d 952, 1998 WL 110078, at *4 (5th Cir. 1998) (quoting *Guthrie v. Tifco Indus.*, 941 F.2d 374, 378 (5th Cir. 1991)).

Plaintiff contends in his response in opposition [45] to the motion for summary judgment that Defendants' proffered reasons for Plaintiff's discharge are pretext, or in the alternative, that race was a motivating factor of the termination decision. Plaintiff attaches affidavits and deposition testimony to support his contentions. Plaintiff specifically argues in response to Defendants' proffered reasons for his termination as follows. First, Plaintiff contends that morale was good during his tenure as chief of police, and that "the only difference [during and after his tenure as chief of police] is that the identities of the dissatisfied employees changed after my discharge and the ascension of [interim chief] Bobby Lane." Bingham Aff. [45-2] ¶ 6a. Second, Plaintiff contends that the ratio of investigators to patrolmen at the time of his tenure as chief "is very close to the same under Chief Lane, and he has not been discharged." *Id.* ¶ 6b. Specifically, Plaintiff maintains that during his tenure the ratio of patrolmen to investigators was

15

17 to 8; now, that ratio is 16 to 6. *Id.* Third, Plaintiff attacks Defendants' proffered reason relating to the problems with investigations that led to compromised grand jury reports: "The only critical grand jury report while I was chief of police was the April, 2008 report." *Id.* ¶ 6c. Although Plaintiff acknowledges the problems with investigations at that time, "the problems stemmed from the fact that . . . the chief of detectives[ ] was ill with terminal cancer" and "able to work only part time during his illness. *Id.* Plaintiff also maintains that neither of the two other grand juries during his tenure criticized the police department. *Id.* Fourth, Plaintiff argues that a rumor of a ticket quota during his tenure "was only that—a rumor" and that the so-called ticket quota was never examined. *Id.* ¶ 6d.

Plaintiff attaches to his response the affidavits of Romelle Matthews and Jesse Anderson, two African-American police officers at the time Plaintiff was chief of police, who recount that Pittman told them that "the police department in West Point was arresting too many blacks on drug charges, and that not enough whites were being arrested in West Point on drug charges. Pittman said that West Point wanted a balance in the number of black arrests and white arrests. . . ." Matthews Aff. [45-5] ¶¶ 3–4; Anderson Aff. [45-6] ¶¶ 3–4. Both Matthews and Anderson testified that they both refused to consider race when making arrests and that as a result Pittman began referring to them as "Bingham's Boys," a term both found racially offensive. Matthews Aff. [45-5] ¶¶ 3–4; Anderson Aff. [45-6] ¶¶ 3–4. After the new Board of Selectmen took office, Matthews was discharged and Anderson allegedly was demoted.

Plaintiff specifically argues that race was a motivating factor of Defendants' decision to discharge him based on the existence of a "cut list" on which his name appeared; "the question of how many blacks were being arrested as opposed to whites in narcotics"; the information Plaintiff claims he received from Romelle Matthews, then-Chief of Narcotics Investigations for

16

the City of West Point, regarding the black-to-white arrest ratio; the lack of reasons given by Defendants for Plaintiff's discharge; "the fact that everyone that was retired, fired, terminated or whatever, was replaced by black"; and the fact that the individual who stepped in as interim chief following Plaintiff's discharge was an African American. Bingham Dep. [45-3] at 164–65.

Plaintiff further claims Defendants have shown a pattern of race discrimination. Plaintiff states that "[s]ince the new Board of Selectman has been in office there has been a pattern of white employees being replace[d] by African[-]American employees" and speaks to four instances of such. Bingham Aff. [45-2] ¶ 7; *see also* Pl.'s Br. Opp'n to Def.'s MSJ [46] at 7. Plaintiff argues that Pittman "viewed the police department through the prism of race, and his vote to discharge the plaintiff was based, at least in part, on that overt and admitted racial viewpoint." Pl.'s Br. Opp'n to Def.'s MSJ [46] at 6.

The entire picture Plaintiff paints is one in which genuine disputes of material fact exist that could lead a jury to conclude Plaintiff was wrongfully discharged on account of his race. Accordingly, Plaintiff's Title VII wrongful discharge claims brought against the City of West Point and individual defendants survive summary judgment.

## D. Conclusion

In sum, Defendants' motion for summary judgment [42] shall be GRANTED with respect to (1) the claims asserted against the individually named Defendants in their individual capacities; (2) the 42 U.S.C. § 1981 wrongful discharge claims; (3) the wrongful discharge claim under Mississippi law; (4) the defamation claim; and (5) the intentional infliction of emotional distress claim.

Defendants' motion for summary judgment [42] shall be DENIED with respect to the Title VII claims. The Court finds there are genuine disputes of material fact as to these claims and, accordingly, Defendants are not entitled to judgment as a matter of law on these claims.

Defendants' motion to strike [47] shall be DENIED with respect to Exhibits E and F of Plaintiff's response in opposition [45]; Exhibits E and F of Plaintiff's response in opposition shall remain a part of the record. Defendants' motion to strike [47] shall be GRANTED with respect to Exhibit G of Plaintiff's response in opposition [45]; Exhibit G of Plaintiff's response in opposition is hereby stricken from the record.

Plaintiff's motion to strike [53] shall be DENIED in its entirety.

A separate order in accordance with this opinion shall issue this day.

This, the _10_ day of February, 2012.

_/s/ Glen H. Davidson_
_____
SENIOR JUDGE